**FLEETBOSTON FINANCIAL CORP., Plaintiff,**

**v.**

**FLEETBOSTONFINANCIAL.COM, an internet domain name, Defendant.**

**CIV. A. No. 00–10176–DPW.**

United States District Court, D. Massachusetts.

March 27, 2001.

Lawrence R. Robins, Hinckley, Allen & Snyder, Boston, MA, for plaintiff.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

This case presents the question whether there are limits on which of the 94 United States District Courts may exercise in rem jurisdiction over an internet domain name dispute under the Anticybersquatting Consumer Protection Act.

A Rhode Island financial institution with offices in Boston brought this in rem action in the United States District Court for the District of Massachusetts against an internet domain name that allegedly violates the financial institution's trademark. The name was registered with a domain name registration authority outside Massachusetts by a resident of Brazil, who the plaintiff concedes has had no apparent contact with the United States (other than registering the domain name) and is said not to be amenable to conventional process in any United States jurisdiction. Following the filing of the complaint, the plaintiff arranged for the domain name's Registration Certificate to be deposited with this court. The plaintiff has since moved for a default judgment transferring the registration of the name to it.[1]

---

1. Certain defendants in other litigation before me raising jurisdictional questions in connec-
tion with the ACPA, *Northern Light Technology v. Northern Lights Club,* 97 F.Supp.2d 96

I decline to enter the default judgment and, finding no adequate contact—indeed, no contact other than the filing of this litigation and the subsequent deposit of the Registration Certificate with this court—between this district and the dispute, I will order the Registration Certificate returned to the registry and the case dismissed.

## I.

On January 31, 2000, FleetBoston Financial Corporation commenced this litigation against the internet domain name <www.fleetbostonfinancial.com>. The complaint, as amended, alleges that the domain name is registered in violation of the Anticybersquatting Consumer Protection Act ("ACPA"), Pub.L. No. 106–113, 113 Stat. 1501 (codified as amended at 15 U.S.C. §§ 1114, 1116, 1117, 1125, 1127, 1129 (1999)). The plaintiff reports that the domain name was registered by Jung Y. Lee, a resident of Brazil, with Network Solutions, Inc. of Herndon Virginia on March 15, 1999.[2]

Following the procedures described in 15 U.S.C. § 1125(d)(2)(D), the plaintiff arranged to have Network Solutions, Inc. of Herndon Virginia, the domain name registry, transfer the Registration Certificate to this court. The Certificate was deposited with this court on March 14, 2000.

(D.Mass.2000), *aff'd* 236 F.3d 57 (1st Cir. 2001), sought and were granted leave to brief the issues in this case as amici curiae.

**2.** There is apparently some dispute about how Lee acquired the domain name. The amici assert that the domain name was obtained through a domain name registrar called Register.com, which is located in New York. Neither plaintiff nor amici claim that the District of Massachusetts is the location of the registrar, registry, or other domain name authority that registered or assigned the domain name <www.fleetbankboston.com>.

It is possible that this apparent disagreement arises from a confusion between the meaning of the terms "registry" and "regis-

## II.

The ACPA went into effect on November 29, 1999, as an amendment to the Trademark Act. The ACPA seeks to put an end to the registration, traffic, or use of domain names by "cybersquatters", entities that act with bad faith to profit from the value of existing trademarks of others. *See* H.R.Rep. No. 106–412, at 7,9 (1999).

In an effort to resolve internet domain name disputes involving names registered to persons or entities who are difficult to find or beyond the reach of United States courts, Congress provided in the ACPA for in rem jurisdiction under certain circumstances. The statute provides in paragraph (2) of 15 U.S.C. § 1125(d):

> (2)(A) *The owner of a mark may file an in rem civil action against a domain name in the judicial district in which the domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name is located if—*
>
> (i) the domain name violates any right of the owner of a mark registered in the Patent and Trademark Office, or protected under subsection (a) or (c); and
>
> (ii) the court finds that the owner—

trar." "A 'registry' is the single official entity that maintains all official records regarding registrations in the TLD [top level domain] .... A registrar is one of several entities, for a given TLD, that is authorized by ICANN to grant registration of domain names to registrants. The registrants transmit their registration information to the registry." David Bender, *Computer Law* § 3D.03[3] at 3D–56 (updated to 2000). At the time of registration, Network Solutions was the sole registry for the TLD ".com". *See id.* Thus it appears that Network Solutions is the registry of the domain name while Registrar.com may be the registrar.

(I) is not able to obtain in personam jurisdiction over a person who would have been a defendant in a civil action under paragraph (1); or

(II) through due diligence was not able to find a person who would have been a defendant in a civil action under paragraph (1) by—

(aa) sending a notice of the alleged violation and intent to proceed under this paragraph to the registrant of the domain name at the postal and e-mail address provided by the registrant to the registrar; and

(bb) publishing notice of the action as the court may direct promptly after filing the action.

(B) The actions under subparagraph (A)(ii) shall constitute service of process.

(C) *In an in rem action under this paragraph, a domain name shall be deemed to have its situs in the judicial district in which*—

(i) the domain name registrar, registry, or other domain name authority that registered or assigned the domain name is located; *or*

(ii) documents sufficient to establish control and authority regarding the disposition of the registration and use of the domain name are deposited with the court.

(D)(i) The remedies in an in rem action under this paragraph shall be limited to a court order for the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark. *Upon receipt of written notification of a filed, stamped copy of a complaint filed by the owner of a mark in a United States district court under this paragraph, the domain name registrar, domain name registry, or other domain name authority shall*—

(I) expeditiously deposit with the court documents sufficient to establish the court's control and authority regarding the disposition of the registration and use of the domain name to the court; and

(II) not transfer, suspend, or otherwise modify the domain name during the pendency of the action, except upon order of the court.

(ii) The domain name registrar or registry or other domain name authority shall not be liable for injunctive or monetary relief under this paragraph except in the case of bad faith or reckless disregard, which includes a willful failure to comply with any such court order.

(emphasis supplied).

### III.

The District Courts in which the ACPA authorizes an in rem action to be brought may upon superficial review of the statute appear to be unlimited. Subparagraph (d)(2)(A) provides that the in rem action may be brought "in the judicial district in which the domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name is located...." However, subparagraph (d)(2)(C) provides that a domain name "shall be deemed to have its situs" either where the domain name authority is located, *or* in any judicial district in which "documents sufficient to establish control and authority regarding the disposition of the registration and use of the domain name are deposited with the court." 15 U.S.C. § 1125(d)(2)(C)(ii).

The plaintiff argues that the "situs" provision of § 1125(d)(2)(c)(ii) can have no purpose except to define where an in rem action may be brought. Thus the statute must be read to allow an in rem action to be brought either in the judicial district in

which the registrar, registry, or other domain name authority is located (pursuant to subparagraph (2)(A)), or more broadly in any judicial district that the plaintiff chooses to bring suit (following the deposit procedures of subparagraph (2)(C)(ii)). Under this approach, a plaintiff may bring suit in any judicial district it chooses, and it may have the situs of the res transferred to the federal court in that district simply by filing a copy of the complaint with the domain name registrar, *see* 15 U.S.C. § 1125(d)(2)(D). Under the logic of plaintiff's approach, the instant action could be brought not only in Massachusetts but in Montana, Missouri, Mississippi, Maine or Maryland, indeed in any district plaintiff were, for whatever reason, to choose.

Such a construction of the statute, however, cannot survive a close analysis of the plain language of the relevant provisions, as will be developed in Section III.A. *infra.* Nor is it supported by the concededly untidy legislative history of the ACPA, as will be discussed in Section III.B. Finally, to adopt the plaintiff's interpretation of the jurisdiction granting provisions of the statute would potentially render the statute unconstitutional, and at a minimum offend traditional notions of fairness, as will be demonstrated in Section III.C. *infra.* For these reasons, I decline to adopt the plaintiff's interpretation of the statute: that subparagraph (2)(C) allows a plaintiff to bring an in rem action in a forum other than one specified in subparagraph (2)(A), the judicial district in which the registrar, registry, or other domain name authority is located.

*A. Statutory Construction*

A close reading of the statute demonstrates that subparagraph (2)(A), which authorizes in rem actions "in the judicial district in which the domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name is located," provides the basic jurisdictional grant. Subparagraph (2)(C), which defines the situs of the domain name either in the judicial district of the domain name registrar, registry, or other domain name authority ((C)(i)), *or* where documents establishing control of the registration are deposited with the court, ((C)(ii)), exists to facilitate the continuation of litigation in one of the districts identified in subparagraph (2)(A).

The statute simply does not make linguistic sense if it is read to allow actions to be brought either in the judicial district in which the registrar, registry, or other authority is located *or* in any judicial district that the plaintiff chooses to bring the action. Subparagraph (C) states that it pertains to "an in rem action brought under this paragraph," signifying that it pertains to the same action specified in subparagraph (A). Furthermore, nothing in subparagraph (C) or (D) suggests that it provides for an in rem action other than the one brought under subparagraph (A), which specifies that the action may only be brought in the judicial district in which the registrar, registry, or other authority is located.

The procedure described in subparagraph (D) provides the mechanism by which the domain name can be deposited in the court in the judicial district designated under subparagraph (A). It also relates to "in an in rem action under this paragraph," and continues by specifying that the procedure is commenced when a plaintiff sends the domain name registrar, registry or other authority "written notification of a filed, stamped copy of a complaint filed by the owner of a mark in a United States district court under this paragraph...." (D)(i). Thus, the situs of the domain name can only be transferred *after* a complaint has been filed; the com-

plaint can only be filed in the judicial district in which the registry, registrar, or other authority is located. *See* § (d)(2)(A). Consequently, the situs of the domain name will likewise have to end up in one of those places, despite the language of (2)(C)(ii) which seems to suggest that it could be transferred elsewhere.

■ The plaintiff poses an apparently pertinent question: if no in rem action could be brought except in the district in which the registry, registrar, or other authority is located, why ·does the statute provide a second test of the domain name's situs? As a general proposition, courts attempt to avoid interpreting statutes in such a way as to make any part redundant, *see, e.g., United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955). The plaintiff argues that the only way to interpret the statute to avoid the redundancy is to understand that the statute provides two tests for the location of the situs of the domain name because it allows a plaintiff to bring an in rem action in either location.

Of course, there is redundancy in plaintiff's position as well because its broad reading of subparagraph (d)(2)(C) would essentially consume the narrower reach of subparagraph (d)(2)(A). In any event, it appears the deposit of registration documents was designed to relieve registration authorities of the burdens of appearing in domain name dispute litigation by formalizing a procedure through which those authorities can simply deposit the disputed intangible in a manner not unlike interpleader. *Cf. Hasbro, Inc. v. Clue Computing,* 994 F.Supp. 34, 38–39 & n. 3 (D.Mass. 1997), *aff'd,* 232 F.3d 1 (1st Cir.2000) (noting unwelcome involvement of Network Solutions, Inc., in Colorado injunction and unsuccessful interpleader litigation).

■ A plain meaning analysis of the in rem provisions of the ACPA establishes that the legislation allows a plaintiff to bring an in rem action only in the judicial district in which the registrar, registry, or other domain name authority is located as is specified in subparagraph (2)(A). Since neither the registrar, registry or other authority that registered the domain name <fleetbostonfinancial.com> is located in the judicial District of Massachusetts, I do not have jurisdiction under 15 U.S.C. § 1125(d)(2) to adjudicate the claims presented in this action.

*B. Legislative History of the ACPA*

While I am satisfied that the language of the ACPA restricts in rem jurisdiction to the judicial district in which the registrar, registry, or other domain name authority is located, I have also consulted legislative history as a means to test the validity of the plain meaning construction I have given the statute. I find that the legislative history—despite some puzzling gaps—supports this reading of the statute.

The legislative history of the ACPA is relatively complicated. Bills were introduced in both the House and Senate to protect owners of registered trademarks from "cybersquatters" or "cyberpirates" who sought to benefit unfairly from the value of the mark by registering a domain name that is similar to the registered mark. H.R. 3028 was introduced on October 6, 1999 and immediately referred to the House Judiciary Committee, Subcommittee on Courts and Intellectual Property. The Judiciary Committee issued House Report No. 106–412, which recommended that the bill pass with an amendment. Neither the version of the bill introduced in the House on October 6, 1999, nor the amended version reported out by the Judiciary Committee on October 25, 1999, contained the language of subparagraph (2)(C), the provision that identifies two alternate means of locating the situs of

a domain name. The bill reported out from the Judiciary Committee on October 25, 1999, did not contain the "situs" language at all, and provided for the in rem action to be brought only, and unambiguously, in the judicial district in which the domain name registrar, registry, or other authority is located.[3]

On October 26, the House passed H.R. 3028. But when H.R. 3028 was read into the record on the floor of the House, it was significantly altered from the version reported by the Judiciary Committee the day before. Specifically, subparagraph (d)(2)(B) was altered to contain the "situs" language that appears in the enacted law as subparagraph (d)(2)(C). The Section By Section Analysis, read into the record to serve as legislative history, provides no explanation for how this new section was intended to function or what specific purpose it was meant to serve.[4] The analysis certainly provides no support for the proposition that this language was added to

allow a plaintiff to bring an in rem action in a forum other than those discussed in subparagraph (2)(A), or that it was intended to give in rem jurisdiction to a court other than those discussed in subparagraph (2)(A).

The new H.R. 3028 also differed from the one reported out by the House Committee on the Judiciary in that it included a new subparagraph (2)(C), which contained the language that would ultimately appear in the enacted law in subparagraph (2)(D) after only trivial alterations. This section provides a mechanism by which the domain name registrar, registry, or other authority may avoid liability by transferring control and authority over the domain name to a court when an in rem action is brought. The Section–By–Section Analysis for this paragraph also does not support the proposition that this control transfer mechanism was intended to create jurisdiction in a court other than those discussed in subparagraph (2)(A). In fact,

---

3. The relevant portion of both versions of H.R. 3028 reads in its entirety:

(d)(2)(A) The owner of a mark may file an in rem civil action against a domain name in the judicial district in which *suit may be brought against the domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name if*—
  (i) the domain name violates any right of the *registrant* of a mark registered in the Patent and Trademark Office, or subsection (a) or (c) *of this section, or is a trademark, word, or name protected by reason of section 706 of title 18, United States Code, or section 220506 of title 36, United States Code;* and
  (ii) the court finds that—
    (I) *the owner has demonstrated due diligence and was not able to find or was not able to serve a person who would have been a defendant in a civil action under paragraph (1); or*
    (II) *personal jurisdiction cannot be established over any person who would have been a defendant in a civil action under paragraph (1).*

(B) *The remedies in an in rem action under this paragraph shall be limited to a court order for the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark.*

(C) *The in rem action established under this paragraph and any remedy available under such action shall be in addition to any other civil action or remedy otherwise applicable.* H.R.Rep. No. 412, 106th Cong., 1st Sess. 1999, as reported in Westlaw 1999 WL 970519 (Leg.Hist.) at *3 (emphasis added to denote sections that differ from the law as adopted).

4. The paragraph devoted to § (d)(2)(B) reads:

"Paragraph (2)(B) states that in an in rem action, the domain name shall be deemed to have its situs in the judicial district in which the domain name registrar, or registry, or other domain name authority is located, or where documents sufficient to establish control and authority regarding the disposition of the registration and use of the domain name are deposited with the court." 106 *Cong. Rec.* H10826 (Oct. 26, 1999).

the commentary, even more clearly than the text of the Act, assumes a temporal sequence that makes it impossible for (2)(B)(ii) to provide jurisdiction independent of subparagraph (2)(A). The commentary specifies that "[w]hen a *court of appropriate jurisdiction* receives a complaint filed pursuant to this section, the court will notify the registrar ... who will expeditiously deposit with the court" control over the domain name. 106 *Cong. Rec.* H10826 (Oct. 26, 1999) (emphasis added). Thus, an action must be filed in "a court of appropriate jurisdiction" before control of the registration documents can be transferred to that court. The situs of the domain name cannot be transferred to a court whose jurisdiction is solely predicated on the receipt of control through the mechanism of subparagraph (2)(C) because that mechanism can only be initiated once suit has been filed in an appropriate judicial district.

The October 26 Section–By–Section Analysis further supports the view that Congress did not intend to provide in rem jurisdiction to any court other than those listed in subparagraph (2)(A). In the discussion of subparagraph (2)(A), the commentary specifies that "[t]his type of in rem jurisdiction still requires a nexus based upon a U.S. registry or registrar [that] would not offend international comity." 106 *Cong. Reg.* H10826 (Oct. 26, 1999). The fact that the House proponents showed a concern for international comity that could only be satisfied by a nexus between the court asserting jurisdiction over the domain name and the (pre-

sumably foreign) registrant of the domain name suggests that there was no intention to provide in rem jurisdiction when no such nexus existed. At the very least, if the proponents had intended to provide such comity-offensive jurisdiction in the very next subparagraph, they presumably would have stated clearly they intended to do so. As I discussed above, no mention is made in either the language of the bill or the commentary on it concerning an intention of creating jurisdiction in any court other than the judicial district in which the registrar, registry or other domain name authority was located.

While this survey of the legislative history provides little clarification regarding how Congress intended the "situs" provision of the ACPA to be used or understood, there is no evidence that it intended this language to provide in rem jurisdiction for any court other than one identified in subparagraph (2)(A). Rather, the legislative history chronicled above suggests that Congress intended subparagraph (2)(A) to provide the sole authorization to bring an in rem action. Nothing in the commentary or reports, and nothing said·on the floor of the House or Senate, suggests that anyone in Congress intended to provide for (or even was cognizant of the possibility of) in rem actions anywhere other than in the district in which the registrar, registry, or other authority is located.[5]

*C. Constitutional Concerns*

■ In addition to the language and structure of the statute and the available legislative history, a settled canon of statu-

---

**5.** H.R. 3028 followed a long trajectory before it finally was enacted into law. On October 26, 1999, the House amended S. 1255 by striking out everything after the enacting clause and substituting the text of H.R. 3028. The anti–cybersquatting provisions of H.R. 3028 then appeared in H.R. 1554, the Intel-

lectual Property and Communications Omnibus Reform Act of 1999 and S.1948, the Senate version of H.R. 1554. The anti–cybersquatting provisions were finally enacted as part of H.R. 3194, the Consolidated Appropriations Act of 2000. Pub.L.No. 06–113.

tory interpretation favors an interpretation which does not extend ACPA in rem jurisdiction to any judicial district in which the plaintiff chooses to bring the action. "The principle is old and deeply imbedded in our jurisprudence that [courts] will construe a statute in a manner that requires decision of serious constitutional questions only if the statutory language leaves no reasonable alternative." *United States v. Five Gambling Devices*, 346 U.S. 441, 448, 74 S.Ct. 190, 98 L.Ed. 179 (1953). The interpretation of the provision that is being urged by the plaintiff would be so unmoored from traditional notions of fairness as to raise the prospect of running afoul the due process clause of the Fifth Amendment of the United States Constitution. Courts should avoid adopting a construction of the statute that raises such a serious constitutional question. Even if, on final analysis, a court in this circuit might determine that the statute as read by the plaintiff *could* pass constitutional muster, the reading urged by the plaintiff challenges core values of fairness that undergird the concepts of jurisdiction and venue.

### 1. Territorial Jurisdiction of Federal Courts

■ Because the jurisdiction-granting provision of the ACPA implicates several overlapping concepts of jurisdiction and venue, it may be useful to review some basics about the territorial jurisdiction of the federal courts. In order for a court to act with authority to hear a dispute and render a judgment that will justify recognition, the court must have jurisdiction not only over the subject matter of the suit, but also over the person or property to whom or which the court's judgment will extend. *See* 16 *Moore's Federal Practice*, § 108.01 (Matthew Bender 3d ed.). This type of jurisdiction is often called personal jurisdiction, but it may more generically be called territorial jurisdiction because it can

extend both over persons (in personam jurisdiction) and over things (in rem jurisdiction). *Id.* For a person or property to be amenable to a particular court's jurisdiction, there must be a proper connection between the person or property and the sovereign in whose name the court acts. *Id.*

Both state and federal courts are prohibited by the United States Constitution from entertaining a case over which they do not have territorial jurisdiction. For state courts, this constitutional protection is contained in the Due Process Clause of the Fourteenth Amendment, which "limits the power of a state court to render a valid personal judgment against a nonresident defendant." *World–Wide Volkswagen v. Woodson*, 444 U.S. 286, 291, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The principle is equally applicable to federal courts: "When a district court's subject matter jurisdiction is founded upon a federal question, the constitutional limits of the court's personal jurisdiction are fixed ... by the Due Process Clause of the Fifth Amendment." *United Electrical, Radio and Machine Workers of America v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1085 (1st Cir. 1992).

Ever since the Supreme Court's landmark decision in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the constitutional parameters of territorial jurisdiction have been defined by the "minimum contacts" test, which seeks to embody "traditional notions of fair play and substantial justice." *Id.*, at 316, 66 S.Ct. 154, (*citing Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)).

Reasoning from the proposition that the sovereign that infuses the federal courts with their authority is the nation, some courts, including the Court of Appeals for

this circuit, have held that the Constitution only requires that a person have the required contacts with any part of the nation to be amenable to the jurisdiction of any federal court. *Id.* at 1085 ("the Constitution requires only that the defendant have the requisite 'minimum contacts' with the United States, rather than with the particular forum state"); *Trans–Asiatic Oil Ltd. v. Apex Oil Co.,* 743 F.2d 956, 959 (1st Cir.1984) ("[f]ederal jurisdiction being national in scope, due process only requires sufficient contacts within the United States as a whole"); *see also Busch v. Buchman, Buchman & O'Brien, Law Firm,* 11 F.3d 1255, 1258 (5th Cir.1994) ("[g]iven that the relevant sovereign is the United States, it does not offend traditional notions of fair play and substantial justice to exercise personal jurisdiction over a defendant residing within the United States"); *Fitzsimmons v. Barton,* 589 F.2d 330, 333 (7th Cir.1979) ("[i]t is clear, therefore, that the 'fairness' standard imposed by *Shaffer [v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) ] relates to the fairness of the exercise of power by a particular sovereign, not the fairness of imposing the burdens of litigating in a distant forum.... Here the sovereign is the United States, and there can be no question but that the defendant, a resident citizen of the United States, has sufficient contacts with the United States to support the fairness of the exercise of jurisdiction over him by a United States court"); 16 *Moore's Federal Practice* § 108.04[3] (Matthew Bender 3d ed.).

On this analysis, the Constitution presents no bar to Congress enacting a statute that requires all federal actions, of whatever sort, be brought in Massachusetts, Montana, Missouri, Mississippi or Maryland, for example, regardless of the lack of contacts between the parties and any of those states.

Not all courts, however, have agreed that the Constitution only demands contacts somewhere in the United States in order for a party to be amenable to federal court jurisdiction in any of the judicial districts. For example, the Eleventh Circuit has focused on the requirements of "fairness" and "reasonableness" that structure the approach to jurisdiction in the state courts, and has concluded that "[w]e see no reason why these constitutional notions of 'fairness' and 'reasonableness' ... should be discarded completely when jurisdiction is asserted under a federal statute ...." *Republic of Panama v. BCCI Holdings S.A.,* 119 F.3d 935, 945 (11th Cir. 1997). The court noted that "inconvenience may at some point become so substantial as to achieve constitutional magnitude," *id.,* at 947, n. 25, quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 484, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985),[6] and held that "courts must ensure that requiring a defendant to litigate in plaintiff's chosen forum is not unconstitutionally burdensome." *Id.,* at 947. *See also, Busch,* 11 F.3d at 1259 (Garza, J., dissenting) ("Because the personal jurisdiction requirement is a function of the individual liberty interest, the proper focus for a personal jurisdiction test should be on protecting an individual's liberty interest in avoiding the burdens of litigating in a distant or inconvenient forum. Requiring that the individual defendant in a national service of process case only reside somewhere in the United States does not protect this interest."); *Bellaire General*

---

**6.** This quotation is somewhat out of context and appears more prescriptive than it is because the sentence in *Burger King* from which it is drawn begins "Although the Court has suggested that," and ends "this is not such a case." *Burger King,* 471 U.S. at 484, 105 S.Ct. 2174.

*Hospital v. Blue Cross Blue Shield of Michigan,* 97 F.3d 822, 826 (5th Cir.1996) ("Although we dutifully apply *Busch,* we emphasize our disagreement with it to the extent it concludes that the proper personal jurisdiction test in a national service of process case is whether minimum contacts exist between the individual and the national sovereign"); *(In re Chase & Sanborn Corp.) Nordberg v. Granfinanciera, S.A.,* 835 F.2d 1341, 1345 (11th Cir.1988) (*reversed on other grounds, Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989)); *Handley v. Indiana & Michigan Electric Co.,* 732 F.2d 1265, 1272 (6th Cir.1984); *Horne v. Adolph Coors, Co.,* 684 F.2d 255, 259 (3d Cir.1982).

While the First Circuit appears to have accepted the proposition that the only Constitutional limit on the territorial jurisdiction of any federal court hearing a federal question be that the defendant have minimum contacts somewhere in the United States, this is by no means a settled question among the circuits. Certainly, courts have disagreed sufficiently about whether convenience is a component of the "traditional notions of fairness" infusing due process analysis of territorial jurisdiction that prudence warrants a cautious approach. The question whether the Constitution demands a nexus only between a defendant and some place in the United States or whether some more complicated balancing of interests—including convenience—must be undertaken raises an issue of serious constitutional concern.

### 2. Application to In Rem Actions

This case, of course, introduces a wrinkle not found in any of the cases I have discussed above. The action at issue is an *in rem* action, not an *in personam* action. Thus, in order to understand the constitutional implications of interpreting the in rem provision of the ACPA in the manner advanced by the plaintiff, it is necessary to focus more precisely on the subject of jurisdiction over things.

The amici argue that the constitutional requirements of *International Shoe* were extended to in rem actions in *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), while the plaintiff argues that *Shaffer* does not apply to the type of in rem action permitted by the ACPA. *Shaffer* has been described as heralding a revolutionary shift in jurisdiction jurisprudence, *see* William Reynolds and William Richman, *Understanding Conflict of Laws* § 30, at 76, 84 (1984) ("*Understanding* "), although its holding has commonly been read more narrowly. *Shaffer* held unconstitutional a Delaware statute that allowed stock in a company that was incorporated in Delaware to be "sequestered" in order to compel the personal appearance of a nonresident who was facing suit in the state courts. *See Shaffer,* 433 U.S. at 193, 97 S.Ct. 2569. This sequestration process was described by the Court as a "quasi in rem proceeding." *See id.,* at 199, 97 S.Ct. 2569. Subsequent commentators have attempted to confine the holding of *Shaffer* to this type of quasi in rem proceeding. *See, e.g., Understanding,* at 86–87 ("The opinion in *Shaffer* indicates that these two forms of jurisdiction over property [true in rem and quasi in rem type I] survive the in rem revolution").[7]

---

7. *But see, Porsche Cars North America, Inc. v. Porsch.Com,* 51 F.Supp.2d 707, 712 (E.D.Va. 1999) (superceded by statute) ("courts generally cannot exercise in rem jurisdiction to adjudicate the status of property unless the Due Process Clause would have permitted in personam jurisdiction over those who have an interest in the res. *See Shaffer,* 433 U.S. at 207, 97 S.Ct. 2569"); *Pittsburgh Terminal Corp. v. Mid Allegheny Corp.,* 831 F.2d 522,

Traditionally, three distinctive types of in rem actions have been identified. *See, e.g., Hanson v. Denckla,* 357 U.S. 235, 246 n. 12, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *Restatement 2d of Conflict of Laws* Topic 2, Introductory Note (1971); *Understanding* § 30, at 74. The first, usually called "in rem" or "true in rem," arises when the court adjudicates the property rights corresponding to a particular res, or thing, for every potential rights holder, whether named in the proceeding or not. Examples of this type of true in rem proceeding are forfeiture, condemnation, probate and arrests of vessels in admiralty. *See Understanding* § 30 at 75.

A second class of in rem proceeding is called "quasi in rem," or more specifically "quasi in rem type I," which allocates property rights as against particular named persons. Examples of this type of proceeding are actions to remove a cloud on title to land or actions that seek to quiet title against a particular rival's claim. *See id.*

A third type of in rem proceeding is sometimes considered a subcategory of the second, and is consequently called a "quasi in rem type II" proceeding; it may be also called an "attachment" or "sequestration" proceeding. This type of action concerns the rights of a particular person or persons in a thing, but is distinguished from type I quasi in rem proceedings because the claim against the person that gives rise to the action is not related to the res that provides jurisdiction. That is, the plaintiff does not dispute the property rights of the owner of the res, but seeks to obtain the res in satisfaction of some separate claim. Thus, (for example, as in the case of *Shaffer*) the original action was a shareholder derivative action accusing directors and of-ficers of a Delaware corporation of misconduct. Delaware law allowed the corporation's stock, which existed in Delaware only by reason of the Delaware statute, to be "sequestered," or attached, to compel the corporation to appear in Delaware courts, or if they did not appear, to provide satisfaction for a default judgment. However, the stock itself was not related to the action, except as a means for the court to assert jurisdiction.

Many commentators and some courts have attempted to confine the holding of *Shaffer* to attachment, or type II quasi in rem, proceedings. For example, Judge Bryan recently held that "under *Shaffer,* there must be minimum contacts to support personal jurisdiction only in those in rem proceedings where the underlying cause of action is unrelated to the property which is located in the forum state." *Caesars World, Inc. v. Caesars–Palace.Com,* 112 F.Supp.2d 502, 504 (E.D.Va.2000).

Judge Bryan is not alone in this understanding of the reach of the *Shaffer* decision. For example, a House Report regarding the ACPA also has characterized *Shaffer v. Heitner* as applying only to "attachment" or type II quasi in rem jurisdiction. In discussing the anti–cybersquatting provisions at issue in this case, a House Report assumed the constitutionality of the in rem provision of the bill, stating:

Although more recent decisions have called into question the viability of quasi in rem "attachment" jurisdiction, see *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), the Court has expressly acknowledged the propriety of true in rem proceedings (or even type I quasi in rem proceedings) where

526 (4th Cir.1987) ("The narrow holding of [*Shaffer*] was a simple one: the minimum contacts rule of *International Shoe* would henceforth be applied to actions *in rem* and *quasi in rem,* as well as to actions *in personam* ").

"claims to the property itself are the source of the underlying controversy between the plaintiff and the defendant." *Id.* at 207–08, 97 S.Ct. 2569. The Act clarifies the availability of in rem jurisdiction in appropriate cases involving claims by trademark holders against cyberpirates. In doing so, the Act reinforces the view that in rem jurisdiction has continuing constitutional vitality.

H.R.Rep. No. 464, 106th Cong., 1st Sess. 1999, as reported in Westlaw 1999 WL 1095089 (Leg.Hist.), *256 of 355.[8] *See also, Understanding,* at 86–87.

This effort to narrow the reach of the *Shaffer* holding does not appear altogether consistent with the reasoning of the *Shaffer* opinion or subsequent Supreme Court precedent. Rather, when read closely, *Shaffer* appears to demand that the Fourteenth Amendment be read to prohibit all in rem jurisdiction except when the person whose property rights are being extinguished has had "minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154. Nothing that the Supreme Court has done subsequently casts doubt on that holding.

█ Dicta in *Shaffer* suggests that the Supreme Court intended its holding to extend the minimum contacts test of *International Shoe* to all in rem jurisdiction, not solely to the subcategory of attachment jurisdiction. The court stated "that *all* assertions of state-court jurisdiction must be evaluated according to the standards set forth in *International Shoe* and

its progeny." *Id.,* at 212, 97 S.Ct. 2569 (emphasis added). The *Shaffer* Court questioned whether the Delaware statute at issue could be justified against notions of "fair play and substantial justice" embodied in the Due Process Clause of the Fourteenth Amendment when it is grounded on the formalities of a legal fiction. "The fiction that an assertion of jurisdiction over property is anything but an assertion of jurisdiction over the owner of the property supports an ancient form without substantial modern justification." *Id.* at 212, 97 S.Ct. 2569. Thus, *Shaffer* may be taken to stand for the proposition that Congress cannot avoid the Constitutional requirements of fair play and substantial justice simply by calling an action in rem, and by limiting recovery to the res itself.

The confusion in interpreting the scope of *Shaffer* arises from statements in the opinion that appear to exempt true in rem and type I quasi in rem actions from the purview of the Court's holding. For example, in supporting their claim that true in rem and type I quasi in rem jurisdiction "survive intact the in rem revolution," Professors Richman and Reynolds quote a portion of the *Shaffer* opinion that says,

> The presence of property in a State may bear on the existence of jurisdiction by providing contacts among the forum State, the defendant, and the litigation. For example, when claims to the property itself are the source of the underlying controversy between the plaintiff and the defendant, *it would be unusual* for the State where the property is located not to have jurisdiction.

---

8. This discussion appears in the Conference Committee report that accompanied H.R. 1554, the Intellectual Property and Communications Omnibus Reform Act that incorporated the Anti–Cybersquatting provisions of H.R. 3028. It should be emphasized that the discussion appears in the explanation of subparagraph (2)(A), which grants in rem jurisdiction to courts in the judicial district in which the domain name registrar, registry or other authority is located.

*Shaffer*, 433 U.S. at 207, 97 S.Ct. 2569 (emphasis added).[9] But, as is clear from the quotation itself, the Court did not say that the *International Shoe* standard would not apply when claims to the property itself are the source of the underlying controversy. It said it would be "unusual" for the state not to have jurisdiction in such a case. The Court then went on to explain why it would be unusual:

> In such cases, the defendant's claim to property located in the State would normally indicate that he expected to benefit from the State's protection of his interest.

*Id.* at 207–08, 97 S.Ct. 2569. Indeed, it is an unusual case in which property exists in a state, but the owner of the property has no expectation that the property is within the protection of the state's laws.

That, however, is precisely the instant case. The Anti–Cybersquatting Consumer Protection Act as read by plaintiff would allow an allegedly aggrieved copyright holder to file suit in the state of its choosing, and then compel the registrar of domain names to transfer a document that represents the domain name to that judicial district. The alleged cybersquatter would then have its property rights adjudicated in a forum that it has never been in, much less directed any purposeful action toward, and indeed could not have expected to be hailed into. When interpreted to achieve this result, the ACPA would permit a procedure that plainly offends traditional notions of fair play and justice.

I do not read the holding of *Shaffer* to be limited to type II quasi in rem actions. The logic of *Shaffer*'s limitations would appear to extend to actions in which the existence of the property in the state cannot fairly be said to represent meaningful contacts between the forum state, the defendant, and the litigation. While this will generally be type II quasi in rem actions, it will not be so exclusively.

In *Caesars World*, Judge Bryan acknowledged that *Shaffer*'s *International Shoe* analysis may still be required on true in rem and type I quasi in rem actions when he noted that "[t]o the extent that minimum contacts are required for in rem jurisdiction under *Shaffer*, moreover, the fact of domain name registration with Network Solutions, Inc., in Virginia supplies that."[10] 112 F.Supp.2d at 504. It is precisely this fact that distinguishes *Caesars World* from the present case. In *Caesars World*, the plaintiff sought to bring suit under subparagraph (2)(A) in Virginia, the state in which the registrar of the domain name was located. Thus, in *Caesars World* the alleged cybersquatter had at least made contact with the judicial district seeking to exert jurisdiction by contacting a business in that district and purchasing a service (the registration of its domain

---

9. This is also the language cited by Congress in justification for its conclusion that "the Court has expressly acknowledged the propriety of true in rem proceedings (or even type I quasi in rem proceedings)." *See* H.R.Rep. No. 464, 106 Cong., 1st Sess.1999, as reported in Westlaw 1999 WL 1095089 (Leg.Hist.), *256 of 355, quoted at 24, *supra*.

10. I note an apparent inconsistency in the case law of the Eastern District of Virginia where other judges have held that registering a domain name can not be sufficient minimum contacts for the purposes of in person-

am jurisdiction, *see, Heathmount A.E. Corp. v. Technodome.Com*, 106 F.Supp.2d 860, 865–66 (E.D.Va.2000) (Cacheris, J.) but Judge Bryan found sufficient minimum contacts for in rem jurisdiction in *Caesars World*. *See also Lucent Technologies, Inc. v. Lucentsucks.com*, 95 F.Supp.2d 528, 535 n. 5 (E.D.Va.2000) (Brinkema, J.) (registration is sufficient minimum contact for in personam jurisdiction); *America Online, Inc. v. Chih–Hsien Huang*, 106 F.Supp.2d 848, 855–60 (E.D.Va.2000) (Ellis, J.) (domain name registration agreements with NSI not sufficient contact).

name) from that business. In registering the website, the registrant may be expected to have notice that he would be subject to the jurisdiction of the courts in the Eastern District of Virginia. By contrast here, there is no evidence that the alleged cybersquatter made any contact at all with the Commonwealth of Massachusetts. *Caesars World* is distinguishable because jurisdiction was founded on subparagraph (2)(A), which authorizes that an in rem action may be brought in the jurisdiction in which the domain name registrar, registry or other authority is located, not under subparagraph (2)(C), which the plaintiff argues authorizes a party to bring the action in any district so long as they transfer the domain name certificate as provided by the statute.

Finally, even if *Shaffer* should be read, as the plaintiff has urged, to require a nexus between the forum and the *owner* of the res only in attachment type actions, surely it requires a nexus between the forum and the res itself in all actions. In rem jurisdiction is predicated on the notion that the res is found within the territorial jurisdiction of the court. Leaving aside the discussion about whether, in a federal cause of action, the res may be found anywhere in the United States, or in the state that contains the court asserting jurisdiction, a statute that creates a res out of an intangible bundle of rights, and then gives to any plaintiff with a colorable claim the right to transfer that res to the forum of its choice, anywhere in the nation, offends notions of fair play. A case where the res only appears in the forum state through the action of the plaintiff who sends it there for its convenience in litigation already commenced is an affront to those notions. Other than the plaintiff's convenience in the litigation, no tie binds even the res to the forum state. This is surely contrary to the notions of fair play and substantial justice that underlie the due process requirements of the Constitution, and that form the basis of the very concept of territorial justice.

Serious constitutional questions would be raised by interpreting the statute as the plaintiff requests, to allow an in rem action be brought in a forum other than those specified in subparagraph (2)(A) and thus in a jurisdiction in which the owner of the domain name may have had absolutely no contact whatsoever. Even if in this court those constitutional concerns may be resolved in such a way that the statute as interpreted by the plaintiff could be held constitutional, either because minimum contacts are only required with the United States and not with the forum state, or because minimum contacts are not required at all with the owner of the res but only with the res itself, traditional notions of fair play and justice would be compromised. I must assume, in the absence of a clear indication to the contrary, that Congress did not intend such an outcome. These constitutional and prudential concerns reinforce my plain-meaning interpretation of the statute and my reading of the legislative history to convince me that the situs language in subparagraph (2)(C) does not enable a plaintiff to bring an in rem action in a forum other than one specified in subparagraph (2)(A).

### III. Conclusion

For the reasons stated more fully above, I hold that the ACPA does not provide for in rem jurisdiction except in the judicial district in which the domain name registry, registrar, or other domain name authority is located, as provided in 15 U.S.C. § 1125(d)(2)(A). Thus, I DISMISS the action for lack of jurisdiction.